**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Mar 02 2012, 9:07 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**ABHISHEK CHAUDHARY**
**ADAM MUELLER**
Indiana Legal Services

ATTORNEYS FOR APPELLEES:

**GREGORY F. ZOELLER**
Attorney General of Indiana
Indianapolis, Indiana

**STEPHANIE ROTHENBERG**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TONYA J. CLARK | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 93A02-1108-EX-800 |
| | ) | |
| REVIEW BOARD OF THE DEPARTMENT OF | ) | |
| WORKFORCE DEVELOPMENT and | ) | |
| PCI HOLDINGS, LLC, | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE INDIANA WORKER'S COMPENSATION BOARD
Steven F. Bier, Chairperson
Cause No. 11-R-3152

**March 2, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Tonya Clark (Clark) appeals from the decision of the Review Board of the Indiana Department of Workforce Development (Review Board) affirming an Administrative Law Judge's (ALJ) denial of unemployment benefits to Clark upon a finding that Clark was discharged for good cause. Clark presents one issue for our review: Is the Review Board's decision denying Clark unemployment benefits contrary to law?

We affirm.

Clark was employed as a lead machine operator from 2002 until April 12, 2011, when she was terminated for violating her employer's anti-harassment policy, which states:

> [Employer] is committed to maintaining a work environment, which is free of harassment of any kind including sexual harassment and/or intimidation. We pledge to investigate any complaint promptly and thoroughly. Harassment of any kind, be it of a sexual, racial, national origin or any other nature, is absolutely prohibited.
>
> * * *
>
> It is against the policy of [employer] for any employee, whether a manager, supervisor, or coworker, to harass another employee. Prohibited harassment occurs when verbal or physical conduct that defames or shows hostility toward an individual because of his or her race, color, religion, gender, national origin, age, or disability . . . creates or is intended to create an intimidating, hostile, or offensive environment . . . .
>
> Harassing conduct includes, but is not limited to . . . [e]pithets, slurs, negative stereotyping, or threatening, intimidating, or hostile acts, which relate to race, color, religion, gender, national origin, age, or disability.

*Exhibit Volume* at 34-35. Clark admitted that she was familiar with her employer's harassment policy.

On the morning of April 11, Clark was listening to music while working when a song played on her iPod that seemed to promote a racist message and included the racial slur

2

"nigger." *Transcript* at 27. Clark had never heard the song before as she had asked someone else to put music on her iPod because she did not know how to do it herself. Clark discussed the lyrics of the song with D.B., a co-worker, and repeated the offensive lyrics to D.B. at least four times during the discussion.

Later that day, W.H., another co-worker of Clark's, approached Clark and asked if she had called D.B. "the N word" earlier in the day. *Id.* at 16. Clark denied that she had, but explained that she was merely repeating lyrics to a song. While giving her version of events, Clark repeated the offensive lyrics three to four times to W.H. W.H. was offended by the use of the actual word and asked Clark to instead say "the N word." *Id.*

W.H. and another employee complained to the plant manager about Clark's conduct, i.e., her repeated use of the word "nigger" albeit in reference to the lyrics of a song, and the matter was investigated. The investigation consisted of interviewing W.H., D.B., and others who had overheard Clark's use of the offending language. At least three employees claimed that they were personally offended by Clark's conduct. The following day, Clark was terminated from her employment.

On May 4, 2011, Clark filed for unemployment benefits, but a claims deputy denied her application. Clark appealed this denial, and a hearing was held before an ALJ on June 13, 2011. Both Clark and her former employer participated in the hearing. The ALJ issued a decision on June 14, 2011, finding that Clark had been discharged for just cause and therefore was not eligible to receive unemployment benefits. In addition to the facts set out above, the ALJ recognized Clark's testimony as part of its findings of fact:

According to Claimant's own testimony, she was listening to music on her iPod when a song came of [sic] that shocked her because it seemed to promote a racist message. Because Claimant was so surprised that there was song [sic] like this out there she wanted to share it with a coworker, [D.B.], who she shared music with before. Claimant therefore told the other employee, who was African American, that the song said that the signer [sic] put so much money into his home but now he can't get anything out because the 'niggers' are taking over. The coworker did not seem to be upset or respond negatively so the day continued as normal. A little while later however, another employee named [W.H.] asked Claimant if she called [D.B.] the 'n-word'. Claimant denied calling [D.B.] anything and instead tried to explain why she used the word. In doing so, Claimant repeated the lyrics of the song about three more times, each time saying 'nigger' as the artist had done. At some point [W.H.] told Claimant to stop saying that word and eventually Claimant changed to saying 'n-word' instead of the actual word.

This incident was reported to Employer by [W.H.] and another employee who overheard Claimant use the racial slur. All parties agreed that Claimant did not call anyone that name she just used it to relay the lyrics of a song. However, four employees, including [W.H.] who was a party to the hearing, reported being offended by hearing Claimant use the word so Employer discharged Claimant on April 12, 2011.

*Appellant's Appendix* at 6. The ALJ further acknowledged evidence presented by Clark that on other occasions she had been propositioned, called at inappropriate times, that a photograph of her had been defaced, and that she had been called offensive names, but that no action was taken to punish the offenders. Based on these incidents, Clark maintained that the employer's harassment policy was not uniformly enforced.

The ALJ ultimately concluded that the employer had met its burden in establishing that Clark knowingly[1] violated a uniformly enforced[2] rule and was therefore terminated for

---

[1] The ALJ's finding in this regard was based upon the fact that CLARK had signed a document indicating that she had read the employer's handbook and intended to comply with the terms of the harassment policy.

[2] The ALJ specifically found: "Claimant failed to provide any evidence that another employee in the same position as herself uttered the same racial slur as she did and was not discharge [sic] as she was." *Appellant's Appendix* at 6.

4

just cause. The Review Board adopted and incorporated the ALJ's findings and conclusions with an addendum that stated in pertinent part:

> The Claimant knowingly violated the rule when she continued to repeat the word "nigger" after [W.H.] told her that she was offended by the word and asked her to stop saying it.
>
> [B.E.], Financial Controller and Human Resources oversight, testified that complaints of harassment are investigated. The Employer conducts an investigation by interviewing witnesses to determine what was said and the context. Disciplinary decisions are made on a case-by-case basis after the investigation is concluded. The disciplinary decision is not always discharge. While he confirmed that words such as "nasty ho," "dyke," and "bitch" could be offensive and could be in violation of the policy, he had not been involved in investigations where complaints of those words being used had been alleged. The Review Board finds that the Employer's harassment policy is uniformly enforced in that complaints are investigated and violations are disciplined.

*Appellant's Appendix* at 13-14.[3]  Clark filed her notice of appeal on August 5, 2011. Clark argues that the Review Board erred in concluding that her employer discharged her for just cause, thereby rendering her ineligible for unemployment benefits.

We begin by noting that the Review Board reviews ALJ decisions for errors of fact, law, or procedure based on the record before the ALJ. Ind. Code Ann. § 22-4-17-5(e) (West, Westlaw current through 2011 1st Regular Sess.). The Review Board may "affirm, modify, set aside, remand, or reverse the findings, conclusions, or orders of an administrative law judge." *Id.* Under Indiana's Unemployment Compensation Act (the Act), "[a]ny decision of the review board shall be conclusive and binding as to all questions of fact." I.C. § 22-4-17-12(a) (West, Westlaw current through 2011 1st Regular Sess.). Review Board decisions

---

[3] The Review Board did not hold a hearing or consider additional evidence.

may, however, be challenged as contrary to law, in which case a court on review is limited to a two-part inquiry into: (1) the sufficiency of the facts found to sustain the decision; and (2) the sufficiency of the evidence to sustain the findings of facts. I.C. § 22-4-17-12(f). Under this standard, courts are called upon to review (1) determinations of specific or "basic" underlying facts, (2) conclusions or inferences from those facts, sometimes called "ultimate facts," and (3) conclusions thereon. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314, 1317 (Ind. 1998).

The Review Board's findings of basic fact are subject to a "substantial evidence" standard of review. *Id.* In this analysis the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Review Board's findings. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.,* 693 N.E.2d 1314. The Review Board's conclusions as to ultimate facts involve an inference or deduction based on the findings of basic fact. *Id.* As such, they are typically reviewed to ensure that the Review Board's inference is "reasonable" or "reasonable in light of [the Review Board's] findings." *Id.* at 1318.

Where the matter lies within the particular expertise of the administrative agency, we afford the finding a greater level of deference. *McClain v. Review Bd. of Indiana Dep't of Workforce Dev.,* 693 N.E.2d 1314. Where the matter does not lie within the particular expertise of the agency, however, "the reviewing court is more likely to exercise its own judgment." *Id.* at 1318. We are not bound by the Review Board's conclusions of law, though "[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be

6

inconsistent with the statute itself." *Chrysler Grp., LLC v. Review Bd. of Ind. Dep't of Workforce Dev.*, 960 N.E.2d 118 (Ind. 2012).

Clark argues that the Review Board's decision is contrary to law. The employer bears the burden of establishing that an employee has been terminated for just cause. *Owen Cnty. v. Ind. Dep't of Workforce Dev.*, 861 N.E.2d 1282 (Ind Ct. App. 2007). To establish a prima facie case for violation of a rule under I.C. § 22-4-15-1(d)(2) (West, Westlaw current through 2011 1st Regular Sess.), the employer must show that the claimant (1) knowingly violated; (2) a reasonable;[4] and (3) uniformly enforced rule. *Id*. Once the employer has met his burden, the claimant must then come forward with evidence to rebut the employer's prima facie showing. *Id*.

Clark first challenges the Review Board's finding that she knowingly violated the employer's rule against harassment. Clark contends that she was discharged pursuant to an unwritten stipulation of the harassment policy that someone had to be offended by her conduct.

To have "knowingly" violated an employer's rule, the employee must: (1) know of the rule; and (2) know her conduct violated the rule. *Stanrail Corp. v. Review Bd. of Dept. of Workforce Dev.*, 735 N.E.2d 1197 (Ind. Ct. App. 2000), *trans. denied*. The Review Board must make a finding as to whether an employee knew that his conduct violated an employer rule because the text of I.C. § 22-4-15-1(d)(2) requires a "knowing violation" of a rule rather than merely a violation of a known rule. *Id.* Furthermore, we have previously held that

---

[4] Clark does not challenge the reasonableness of the employer's harassment policy.

misconduct which will justify discharge of an employee so as to make the employee ineligible for unemployment compensation is the "wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rule, or wrongful intent." *Merkle v. Review Bd. of Ind. Emp't Sec. Div.,* 120 Ind.App. 108, 90 N.E.2d 524, 526 (1950).

The employer presented evidence that all employees are presented with the employee handbook and that the first four pages of the handbook set forth the harassment policy for the company. Further, Clark admitted that she was aware of the harassment policy. Clark also testified that when she heard the offensive lyrics she was "shocked" and that she felt the song was "nasty." *Transcript* at 27. Clark agreed that the song could be characterized as "racist" and admitted that she was offended by it. *Id.* Despite her own recognition of the inappropriateness of the lyrics, Clark repeatedly attempted to share her disbelief of the content of the song by repeating the lyrics, including the use of the word "nigger", to a co-worker several times. When later confronted about her use of the offensive term, Clark, in attempting to explain the lyrics to the song, again used the actual offending language several times. The co-worker explicitly told Clark that her use of that term was offensive and asked Clark to say "the n word" instead of the actual word, and yet, Clark continued to say the actual word. *Transcript* at 16. Clearly, Clark's conduct created an intimidating, hostile, or offensive environment. Clark's own testimony proves that she was well aware of the offensive nature of lyrics, but nonetheless, she continued to repeat them out loud. This evidence supports the Review Board's determination that Clark knowingly violated the employer's harassment policy.

Clark next argues that the evidence does not support the Review Board's determination that the employer's harassment policy was uniformly enforced. Our Supreme Court has explained our review of such a determination as follows:

> The standard of review of the Board's decision depends in the first instance on whether uniform enforcement is a question of basic fact, ultimate fact, or a question of law. In order to evaluate uniformity one must first define the class of persons against whom uniformity is measured. This is usually a rule of law but it may be informed by appropriate findings as to employer practices, etc.

*McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d at 1319. Once the class is defined, the question of whether the employer treats the persons within the class consistently is a basic factual inquiry and is reviewed subject to the substantial evidence test and for conformity to law. *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314. The question to be addressed is whether the enforcement "'is carried out in such a way that all persons under the same conditions and in the same circumstances are treated alike.'" *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d at 1319 (quoting *General Motors Corp. v. Review Bd. of the Ind. Dep't of Workforce Dev.*, 671 N.E.2d 493, 498 (Ind. Ct. App. 1996)).

Clark first argues that the Review Board erroneously defined the class of persons against whom uniformity is measured as employees in the same position as Clark who uttered the same racial slur as she did. Clark asserts that the harassment policy as set forth in the employee handbook should apply to "any employee, whether a manager, supervisor, or coworker" and to all types of harassment including "race, color, religion, gender, national origin, age, or disability." *Appellant's Appendix* at 7. Under this class definition, Clark maintains that the employer did not uniformly enforce the harassment policy and specifically

directs us to testimony of a witness on her behalf in which the witness claimed to have been harassed while working for Clark's employer, but claims that nothing was ever done about it.

We agree with Clark that under the harassment policy, the class is any employee that engages in any type of harassing behavior that creates or is intended to create an intimidating, hostile, or offensive environment. Testimony from the Plant Manager, the Financial Controller/Human Resources Manager, and W.H., an employee for over fifteen years, demonstrates that the harassment policy is effective as against all employees and that the employer takes seriously its role of investigating complaints.

The Plant Manager testified that Clark was discharged for violating the harassment policy of the employer and that he was unaware of any instance where an employee had violated the harassment policy. The Financial Controller/Human Resources Manager also testified that he did not know of any employee that had violated the policy and been terminated for it. In any event, the Financial Controller/Human Resources Manager explained that any type of derogatory word harassment would be investigated on a "case by case basis" and that the use of the derogatory words would be examined in light of the circumstances of each case. *Transcript* at 20. The Financial Controller/Human Resources Manager indicated that an investigation would be launched no matter what type of derogatory term (e.g., the N word, dyke, or nasty ho) was used. The Financial Controller/Human Resources Manager was not aware of any incidents in which such other terms may have been used, nor were any complaints filed informing him of such incidents.

Further, even though this was the first incident of an employee using the term "nigger" in the workplace, such does not mean the harassment policy was not uniformly enforced. "A

10

policy that has not been the basis for termination of an employee in the past may nonetheless be 'uniformly enforced' even if only one person is the subject of an enforcement action, so long as the purposes underlying uniform enforcement are met." *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d at 1319. Here, even though this is the first known violation, there is substantial evidence in the record to support the Review Board's conclusion that the employer's harassment policy is uniformly enforced, that Clark violated the employer's harassment policy, and that Clark was terminated for just cause.

To rebut the employer's prima facie showing, Clark presented her own testimony and testimony of a former co-worker that they had both made complaints about harassing behavior directed at each of them individually and both claimed that the employer took no action and their complaints were never investigated. There was no written documentation, however, to show that they had made complaints to the employer. Financial Controller/Human Resources Manager testified that he was working during the time that Clark's witness was employed and that he never received any complaints from her or any reports made on her behalf. With regard to Clark, the only evidence was her testimony and a defaced picture of her. Financial Controller/Human Resources Manager stated that if he had been made aware of what Clark now claims was harassment directed toward her, he would have investigated such matter as he did in the instant case and would have taken appropriate action as the circumstances may have warranted.

The ALJ acknowledged Clark's testimony regarding other incidents of harassment she claims were never investigated. The Review Board adopted the ALJ's findings and conclusions and included an addendum in which the Review Board stated:

11

> While he [Financial Controller/Human Resources Manager] confirmed that words such as "nasty ho," "dyke," and "bitch" could be offensive and could be in violation of the policy, he had not been involved in investigations where complaints of those words being used had been alleged. The Review Board finds that the Employer's harassment policy is uniformly enforced in that complaints are investigated and violations are disciplined.

*Appellant's Appendix* at 14. The Review Board's addendum clearly shows the Review Board found that the harassment Clark claims went uninvestigated was a product of non-reporting, not a result of the employer's failure to investigate. Implicit in the Review Board's conclusion is that the employer would have investigated any and all alleged violations of the harassment policy and meted out discipline accordingly if the alleged violations had been reported. The Review Board's determination is consistent with its conclusion that the employer's harassment policy is uniformly enforced in that complaints are investigated and violations are disciplined.

The Review Board's determination that Clark was terminated for just cause and therefore is ineligible to receive unemployment benefits is not contrary to law.

Judgment affirmed.

RILEY, J., and MATHIAS, J., concur.